**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

ROBERT SCOTT BROOKS

        Plaintiff,

v.

JORDAN FOX, Individually,
BENJAMIN MOORE, Individually,
AMY MOORE, Individually,
ALEC RHODES, Individually,
RILEY RHODES, Individually,
MIDFIRST BANK, a Privately Owned Financial Institution,
JOHN DOES #1-10, and
JOHN DOE CORPOREAL ENTITIES #1-10

        Defendants.

---

## COMPLAINT

---

For his Complaint against Defendants, Plaintiff Robert Scott Brooks alleges as follows:

### I.      PARTIES, JURISDICTION, AND VENUE

1. Federal jurisdiction herein is based upon 28 U.S.C. § 1332.

2. This action concerns the fraudulent transfer, and interests in and affecting, the following

real property located in the City and County of Denver, State of Colorado:

      A.      2650 South Fillmore Street, more particularly described as Lots 13 & 14, Block

26, Iliff's University Addition, and

B.      2658 South Fillmore Street, more particularly described as Lots 15 & 16, Block

26, Iliff's University Addition, (hereinafter described as "the subject properties").

3.   Robert Scott Brooks ("Scott Brooks" or "Brooks") maintains his United States legal

residence at 37 Hawthorne Drive, #221, Bedford, NH 03110 and is the plaintiff herein.

4.   Defendant Jordan Fox, Esq. ("Fox"), Individually, upon information and belief, resides at

3150 Jay St., Wheatridge, CO 80214. He conducts a practice of law as a licensed attorney and as

a Partner in the law firm of Sherman and Howard, LLC, whose business address is 633 17th St.,

Suite 3000, Denver, CO 80202. He is party to tortious and/or fraudulent conduct as hereinafter

set forth and as partially evidenced by his writings discovered to date detailing his voluntary and

written inducements to others offering advice and/or seeking their participation in various

unlawful acts and conduct.

5.   Defendant Benjamin Emanuel Moore or Benjamin E. Moore ("Benjamin Moore"),

Individually, resides at 1840 S. Washington St., Denver, CO 80210, and is a party to a Land

Development Agreement ("LDA") with Scott Brooks.

6.   Defendant Amy E. Moore ("Amy Moore"), Individually, resides at 1579 S. Clayton St.,

Denver, CO 80210, and has been party to the commission of both tortious and fraudulent

conduct as hereinafter set forth.

7.   Defendant Alec Rhodes, Individually, upon information and belief, resides at 2450 S.

Josephine Street, Denver, CO 80210. Alec Rhodes is a transferee of the subject properties herein

and claims an interest therein. Rhodes is a real estate expert having by his own admission been in

involved in over $1.75 billion in real estate transactions, is, upon information and belief, a valued

private banking client of MidFirst Bank and the Denver Managing Director of the 53,000+ employee and publicly-traded Cushman-Wakefield corporation of New York, NY. He has been well known to Jordan Fox and/or his law firm.

8. Defendant Riley Rhodes, Individually, upon information and belief, resides at 2450 S. Josephine Street, Denver, CO 80210. Riley Rhodes is a transferee of the subject properties herein and claims an interest therein.

9. MidFirst Bank is the largest private bank in the United States, and conducts business in Colorado with multiple locations, one of which is at 555 17th St., Denver, CO 80202. It is a lender with respect to the subject properties and may claim an interest of record in the subject properties.

10. John Does and John Doe Corporeal Entities include all others of record and those unknown of record yet to be determined, having or claiming an interest ahead of that of Scott Brooks in the real property known and numbered as 2650 S. Fillmore St. and 2658 S. Fillmore St., Denver, CO, and more particularly legally described above.

11. Defendants John Does #1-20 and John Doe Corporeal Entities # 1-10 refer to presently unknown persons or entities, other than as described above, who may be or may have been party to or part of the tortious and/or fraudulent conduct or part of the enterprise complained of herein.

12. The Defendants collectively, as hereinafter more specifically specified, constitute the enterprise complained of herein.

13. The Defendants have transacted business within Colorado and/or committed torts within the State of Colorado.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the conduct giving rise to Plaintiff's claims occurred within this District.

## II.   GENERAL FACTS AND ALLEGATIONS

15. Scott Brooks and Benjamin Moore entered into a written Land Development Agreement (sometimes hereinafter "LDA") dated January 28, 2016, a recorded copy of which is attached hereto and incorporated herein by reference as <u>Exhibit 1</u>. To remedy issues of alleged lack of awareness and/or notice of the LDA asserted by Fox, the LDA was recorded with the Clerk and Recorder of the City and County of Denver and placed on public record on September 26, 2019 at 10:39 a.m.

16. The LDA has as its subject the development and/or disposition of the subject real properties on S. Fillmore Street.

17. At the time of the LDA on January 28, 2016 the subject properties were yet to be transferred and remained titled in the following names:

    A.    2650 S. Fillmore was titled in the name of William S. Gum and Barbara E. Gum.

    B.    2658 S. Fillmore was titled in the name of Dennis Perron.

18. Both of the Fillmore properties were thereafter conveyed as follows:

    A.    2650 S. Fillmore which became commonly referred to as the "upper lot" by the parties involved, became subject to a purchase contract on February 15, 2016. This represented the beginning of carrying out the terms of the LDA. The Gum property, or the "upper lot", and for reasons currently unknown, came to be titled in the names of both Benjamin and Amy Moore. The transfer by deed occurred on September 20, 2016.

B.      2658 S. Filmore, which became commonly referred to as the "lower lot" by the

parties involved, became subject to a purchase contract while titled in the name of Dennis

Perron. It closed on July 5,2016 and was transferred into the name of Benjamin Moore.

19. The subject properties had common regulatory overlay conditions relative to stormwater

management, that, on the surface and to the casual observer, decreased apparent value by means

of introducing fear, uncertainty, and doubt to the uninformed. Half-hearted efforts to look into

and understand the stormwater regulatory process (fueled mainly by an overheated Denver "go-

go" real estate market) tended to reinforce these implied discounts, as did cursory negative

"drive-by" valuations and rumor mongering by the uniformed, unsophisticated, and

inexperienced.  The highest and best use fully informed market participants would garner was

overlooked in the "rush" mode. that a healthy, but fully informed marketplace would normally

perceive.

20. The very same regulations that those who skimmed over the surface found deflating are,

in reality, an opportunity contributing to the consolidated property value and making the building

site more unique and valuable as scarcity typically adds to value. This technical, legal, and

economic reality existed due to the simple combination of:

A.      The factual circumstances of these particular lots abutting one another, being in a

desirable neighborhood and sitting aside a large public park (guaranteeing perpetual green

space, and more importantly relief from the too often over-sized and looming structures of

neighbors). The lots also abutted properties with even larger lot consolidations and values,

(sidestepping the negative of being the "largest" or highest value in the neighborhood), and

B.      every day application of the ordinary skill, knowledge, and experience of properly incentivized, problem-solving real-estate people who properly and unemotionally can consider and work with drainage courses, floodways, floodplains and wetlands; all of which are often regulated individually or by common delegation of oversight, most commonly by and amongst the US Army Corp of Engineers, Federal Emergency Management Agency (FEMA), as well as State and local stormwater management agencies.

21. Understanding how to prosecute permitting as well as the order of operation of seeking regulatory approvals actually allows the consolidated property to be built upon in a more flexible and generous manner than "vanilla" tract building lot build-out seen throughout the real estate boom.  Proper permitting also adds to landscape and social relief opportunities from intruding neighbors and their large homes often built on tighter single lots.   This creates a more unique and desirable site plan. The heat of the "go-go" Denver real estate market then and now awards value for added building square footage, oversized garage spaces and added bays, as well as for relief from prying neighbors.

22. By the end of 2018, a 97% +/- complete and building department compliant architectural plan set and various three-dimensional renderings of those detailed plans were complete. They consist of some thirty or so architectural size sheets and renderings.  Two renderings are attached hereto as Exhibit 2. These represent detailed proof of the premium site dynamics and livable square footage allowed.

23. The reality of the properties' "premium" value had been demonstrated by the time Amy Moore filed a surprise divorce proceeding. This value was then conveniently and purposefully ignored in a knowing and willful manner by at least Amy Moore and Jordan Fox in a rush to

generate cash for their personal use and benefit. Benjamin Moore and others, including, but not necessarily limited, upon information and belief,  to realtors who were close friends with Amy Moore, in the course of conduct hereafter described, have, upon information and belief, side-stepped and/or mis-directed interested parties away from what was known and already documented to be the facts. Upon information and belief, Defendants Alec Rhodes and Riley Rhodes, who have taken possession and scrapped the modest prior structure(s), are complicit. As of this filing the consolidated homesite is vacant land and, based upon information and belief, is currently subject to permitting processes of the new Buyer's election.

24. On or about July of 2019, LIV Sotheby's International Realty, in consultation with and benefiting from the full disclosures of the interested parties; issued an opinion of value, accompanied by a listing agreement, suggesting the consolidated property be listed at an "ask" of $2,125,000. The writing went on to further confirm the uniqueness of the location and of the consolidated residential site abutting a huge greenspace, the oversized building allowance in terms of square footage and valuable amenities (garages and guest house) and further stated that, strategically speaking, a "take" price of  $1,800,000 should be seen as a reasonable compromise or "bottom line" negotiated sales price. A copy of the report is attached hereto and incorporated herein by reference as Exhibit 3.

25. Only a month later, or August of 2019, Defendant Amy Moore by and through her Attorney Jordan Fox communicated to other counsel, as documented in writing at the time, (see hereto, Exhibit 4), that he had three valuations of the property that they "sent over" and one of which came in at $1,850,000, or $50,000 higher than the Sotheby's recommended "accept" price. Amy Moore's Counsel and/or successor Counsel Fox had gained this conclusion of value

*independently* and upon their own inquiries in their roles as counsel of record for Amy Moore. By this time, Fox and Amy Moore further had secreted into their possession the original personal and business documents of Benjamin Moore, which gave or should have given them even further insight. Upon information and belief, Amy Moore had taken these documents from a filing cabinet with individual drawers known to be dedicated to one another's private files. The stolen documents, upon information and belief, made Jordan Fox and Amy Moore directly and more fully aware of all the documents surrounding the property. They would later feign a lack of particular knowledge when it was convenient.  No knowledge of the properties' true value could have been lacking after Amy Moore's participation in more than 12 months of the design of the luxury 8,000 (+/-) square foot home she supposedly was designing for her family's future (a specific alternative available under the LDA). The written documents, as existed before direct hostility and spite broke out within the marital estate, as of August 2019, clearly shows an agreed upon consensus value for the property of between $1,800,000 and $1,850,000.

26. Also, and some three years prior to Attorney Fox's valuations, FirstBank originally appraised the lots "individually" on a "stand alone" basis, as they sat, not combined, at a value of $1,190,000, and considering the Flood plain a de-valuation factor.  See attached FirstBank appraisals, Exhibit 5 hereto.

27. Jordan Fox and Amy Moore dumped the lots in 2019 to a friendly party for a deeply discounted price of just $975,000 (53% of the consensus value) causing a substantial economic loss.  Defendant Amy Moore  did so in the face of: (a) three years of run-away Denver market appreciation having occurred , (b) it being three years since First Bank independently valued the lots at $1,190,000 and  (c) creating false impressions so as to force the listing of the lots for sale

and putting them in the hands of her close friend and real estate agent Jenny Wiens at a list price of $1,500,000 (at least $300,000 below the documented consensus valuation) but still $600,000 higher than the price for which Defendant Amy Moore sold them to Defendants Rhodes'.  With Jordan Fox in charge, he then prioritized payment(s) to himself and was able to keep the vast bulk of the net sales proceeds to pay himself a six-figure legal fee just four months into the divorce proceedings. Amy and Benjamin Moore were behind on their bank payments and generally insolvent when Fox took on the legal representation of Amy Moore in the divorce matter. It was readily apparent to all, that based upon the filed Statements of Financial Support ("SFS") in the dissolution proceeding, that Jordan Fox's fees were "at risk" and that he was likely to simply become another creditor. Overspending by Amy and Benjamin Moore had piled up debts in the time just prior to Amy Moore's filing of her surprise divorce

28. The transfer of the real properties were accomplished through a series of machinations, hereinafter described, which included, at a minimum, negligence by one or more persons, intentional acts by one or more persons, and fraudulent conveyance of the subject properties for substantially less than either their reasonably equivalent value or their fair market value. The machinations came to include, but were not necessarily limited to, the conduct of an organized and orchestrated disinformation fraud upon the domestic relations division of the District Court of the City and County of Denver, as hereinafter more specifically set forth. This conduct hindered, delayed, and defrauded Scott Brooks, a creditor, as well as other creditors of record, who were known to at least Amy Moore and Jordan Fox.

29. The conduct effectuating the discounted sale occurred in the swirl of (a) a foreclosure action against the subject properties, (b) a vicious divorce proceeding filed in surprise by Amy

Moore against her husband (the steward of the property) and (c) an involuntary bankruptcy filed against Benjamin Moore by one of several qualified creditors disturbed by the disinformation, evasion efforts and theatrics of Benjamin Moore, and/or Amy Moore, and/or her attorney, Jordan Fox.

30. These matters vitiate clear title to the purchaser. Because the involuntary bankruptcy was subsequently dismissed, the actions of the Denver District Court are not actionable as a violation of the Automatic Stay; however, they are indicative of multiple badges of fraud including. but not limited to, *inter alia*, intent to hinder, delay or defraud a creditor, active misrepresentation, concealment, and evidence of implementing a scheme to defraud by effecting a conveyance at less than a fair equivalent value.

The Foreclosure

31. Due to the pre-divorce financial struggles of the Moore family estate, ultimately a Notice of Election and Demand was filed on or about June 21, 2019, by FirstBank to foreclose on its Deed of Trust on Lots 15 and 16, Block 26, Iliff's University Addition in Denver, Colorado, commonly known and numbered as 2658 S. Fillmore Street, Denver, Colorado 80210. The Notice of Election and Demand did indicate on its face that the property was all of the property encumbered by the particular Deed of Trust.

32. The promissory note secured by the Deed of Trust and the Deed of Trust were signed by Benjamin Moore. There were, however, three (3) written modifications of the Deed of Trust, dated July 1, 2017, July 20, 2018, and February 11, 2019, each executed by Benjamin Moore.

33. Attorney Aaron Garber informed the Denver County Public Trustee of the "Notice of Bankruptcy – Foreclosure Case No. 2019-000290" on October 23, 2019. Attorney Garber provided such notice both by means of e-mail and in a written document, received by the Denver Public Trustee on October 23, 2019, at 3:19 p.m. See Exhibit 6 attached hereto. This notice explicitly invoked the Automatic Stay of 11 U.S.C. § 362(a).

34. A Sale, according to the Records of the Denver Public Trustee, had been scheduled for October 24, 2019. This sale was continued to October 31, 2019, and ultimately placed "On Hold."

35. The Notice of Election and Demand for Sale by Public Trustee was then withdrawn by FirstBank on December 6, 2019

36. The mailing list for the foreclosure proceedings included both Benjamin and Amy Moore as well as William Hunnicutt, Amy Moore's prior divorce lawyer.

37. Upon knowledge, information and belief, both Benjamin Moore, Amy Moore and their counsel at all times knew and/or should have known about each of the scheduled sale dates, the receipt of the Notice of Automatic Stay by the Public Trustee, and the effect of the Automatic Stay, as elsewhere herein discussed. In fact, by the time of the involuntary bankruptcy, Jordan Fox was both (1) representing Amy Moore and (2) holding himself out as an "expert" on the U.S. Bankruptcy Code's Automatic Stay provisions having published in the Colorado Lawyer (See Exhibit 7) that the effect of such a filing was to "stay any act to exercise control over property of the bankruptcy estate". Fox ignored his own prior published expert advice as he continued to manipulate the sale of Debtor's property at a sharply discounted price.

<u>The Dissolution Proceeding</u>

38. Sums due Scott Brooks pursuant to the Land Development Agreement are a liability of the marital estate.  They were listed as such in the first PFS filed in the divorce by Benjamin Moore on or about July 25, 2019.  To the extent the property could be successively transferred without recognizing and paying this liability, both the petitioner and respondent would benefit by a diminution of the amount of marital debt.

39. In the telephone status conference of August 28, 2019, with the Denver District Court, Jordan Fox and Amy Moore made representations, misrepresentations, and failed to disclose the genuine status of the real properties and concealed other critically relevant information. This was in furtherance, and ongoing engagement in, an active concealment from the Court. By means of these affirmative misrepresentations and failures and omissions to disclose to the Court, Amy Moore's counsel, Jordan Fox, secured a Court order that Amy Moore was authorized to liquidate the parties' consolidated lots on Fillmore Street in Denver because the properties were then in foreclosure. Amy Moore and Jordan Fox, represented to the Court that "…the lots were listed and an offer had been made and accepted by Petitioner…Under the circumstances of a pending foreclosure and the reality that one of the lots is in the flood plain, the realtor advises this is likely the very best the parties can do. A number of otherwise interested buyers indicated that they were simply content to wait for the foreclosure sale." The referenced realtor, upon information and belief, was a close friend of Amy Moore's.

40. A further telephone status conference was held on October 15, 2019. Again, Jordan Fox and Amy Moore continued their campaign of misinformation despite having further opportunity to be frank with the Court and other parties of interest. Immediately following the phone

conference, the Court ordered entry of an order directing the Clerk of the Court to execute the contract in its Order of October 15, 2019, a copy of which is attached hereto as Exhibit 8.

41. During the telephone status conference of October 15, 2019, Jordan Fox informed the Court that a bankruptcy filing was or may be forthcoming. This demonstrates knowledge and constructive notice of the pendency of a bankruptcy filing, and, at a minimum, the birth of a duty of inquiry, by Attorney Fox and Amy Moore with respect to confirming the status of any bankruptcy filing prior to executing closing documents. Fox further brazenly ignored sharing with the Court his own prior published expert advice to the Colorado Bar relative to the Automatic Stay's effect and the impact of the US Bankruptcy Code's look back period(s). He went on to blatantly misstate the law and in representing to the Court that if the plan for Mr. Moore "is to plan a bankruptcy" either this week or next week, "…it appears that this [the relief Attorney Fox and Amy Moore were seeking] is the only way to preserve any of the equity in the home".  Transcript of October 15, 2019 hearing, page 4, attached as Exhibit 9 hereto.

42. Attorney Michael Davis also appeared and spoke. He indicated specifically there were other creditors of Mr. Moore

> "…who would be interested in – who may have an interest in proceeds coming from the sale…several of the creditors, have discussed the possibility of filing an involuntary bankruptcy case to stop the sale….[I]n the case of the sale of the Filmore property, it would be and it would provide creditors the stay necessary to be able to get a sufficient price for the property to set aside some of their claims, and…that's what their interest is…" Id., at 10.

43. Mr. Davis further pointed out to the Court that

> "…in light of the fact that a significant asset would be lost in a foreclosure sale, it's unlikely that the creditors would allow foreclosure sale to go forward and the filing of an involuntary bankruptcy would place the automatic stay in effect so that something could

be done with the property that would allow a sufficient return to satisfy their claims…"
Id., at 11.

44. The Clerk of the Court did nonetheless execute either or both of a contract and thereafter a Quit Claim Deed conveying Benjamin Moore's interest in both lots to Amy Moore.

45. Amy Moore, based on the delegation of authority by the Court, which expressly provided all proceeds were to be held in escrow subject to ultimate order by the court, i.e. *in custodia legis*, executed a General Warranty Deed, on October 24, 2019, with actual and/or constructive knowledge of the filing of the Bankruptcy prior to that time and in purposeful disregard of the previously recorded Land Development Agreement. A copy of the Deed is attached as <u>Exhibit 10</u>.  In connection with the closing, Amy Moore falsely and fraudulently executed an Affidavit and Indemnity Agreement to the Heritage Title Company specifically representing that, *inter alia*, "…there are no unrecorded contracts, leases, easements, or other agreement or interests relating to said premises of which we have knowledge…"

46. Amy Moore signed the upgraded general warranty deed (having only received possession with the rights of a Quit Claim standing) with respect to each lot, with separate signature blocks and representations of authority inherently as to each lot. She was acting as an agent of the court in the capacity of a custodian. Amy Moore was dealing with marital assets and marital property. All of which were subject to the jurisdiction and control of the Denver District Court until the moment the Automatic Stay arose, as described below, at which point all jurisdiction with respect to any and all property of the debtor Benjamin Moore passed to the United States Bankruptcy Court and all proceedings pertaining to property of the bankruptcy estate were automatically stayed.

## The Bankruptcy

47. A single creditor filed an involuntary bankruptcy petition against Benjamin Moore on October 22, 2019, in the United States Bankruptcy Court for the District of Colorado, Case Number 19-19114EEB.

48. Upon the filing of this petition the Automatic Stay provided by 11 U.S.C. § 362 arose and requires that all actions by anyone with actual or constructive notice and affecting the estate of the debtor be ceased and stayed with jurisdiction thereof passing automatically to the United States Bankruptcy Court. Such a stay is binding upon anyone dealing with any property of the estate, including courts, and including the Denver District Court handling the dissolution proceeding in which the debtor Benjamin Moore was involved. Notice of the U.S. Bankruptcy Court's jurisdiction can be either actual notice or constructive notice but carries the same binding effect under the U.S. Bankruptcy Code.  The powers of that Court's Order to stay all actions and activities against or involving a debtor are far-reaching and well established.

49. On October 23, 2019, a notice of the Automatic Stay was provided to the Public Trustee of the City and County of Denver, wherein there was a pending foreclosure, Case Number 2019-000290, with respect to that real property located at 2650 S. Fillmore Street.

50. The Debtor's estranged wife, Amy Moore, and her then attorney, Jordan Fox, had actual and/or constructive notice of the Automatic Stay prior to the time of her signing the General Warranty Deed. She and Jordan Fox repeatedly and utterly failed to candidly disclose this to the Denver District Court and others in the dissolution proceeding, from whence had arisen her authority to sell the property.  It was necessary to engage in these acts of concealment in order to

proceed with the conveyances and transfers of the real properties, by which multiple defendants were unjustly enriched.

51. Jordan Fox knew, and Amy Moore, if properly and honestly advised, should have known, that upon the filing of a bankruptcy proceeding the dissolution court lost its jurisdiction over property matters.

52. Because the involuntary bankruptcy was subsequently dismissed, the actions of the Denver District Court are not actionable as a violation of the Automatic Stay; however, they are indicative of multiple badges of fraud including. but not limited to, *inter alia*, intent to hinder, delay or defraud a creditor, active misrepresentation, concealment, and evidence of implementing a scheme to defraud by effecting a conveyance at less than a fair equivalent value.

<u>Other Related Considerations</u>

53. Defendants Alec Rhodes and Riley Rhodes upon purchasing the subject properties placed a new, first Deed of Trust thereon to the benefit of MidFirst Bank. The first Deed of Trust of MidFirst Bank are subordinate to the interest in the subject properties claimed by Scott Brooks by virtue of his having recorded the Land Development Agreement ahead of, and prior to, the new loan made by MidFirst Bank and its recorded Deed of Trust.

54. Jordan Fox is a licensed attorney in the state of Colorado and, upon information and belief, is a member of the law firm of Sherman and Howard LLC. As hereinafter set forth, Jordan Fox, actively helped to arrange for the sale of property, and most genuinely because he sought to obtain a  legal fee advance of $100,000, and thus  made and continued to systematically make multiple misrepresentations of law and fact to the Denver District Court in the dissolution

proceeding involving the Moore's. The over-burdened District Court (marital division) acted in reliance upon the knowing misrepresentations and salesmanship of Fox and his standing as an Officer of the Court.  Attorney Fox is obligated to be frank, forthright, and candid with all courts. Mr. Fox failed to disclose, among other important facts, that he was the single largest direct beneficiary of the quick cash the subject properties' bargain sale generated in having been sold for less than their fair or equivalent value. As such, *inter alia*, he has transferee liability, having received some of the proceeds of the conveyances or transfers.

55.  Upon information and belief, Amy Moore and her attorneys had knowledge of the LDA as early as May 2019, if not before, and were on notice of the related indebtedness as a marital debt no later than July 25, 2019 with the filing of Benjamin's Moore's Personal Financial Statement ("PFS") in the divorce.

56. The real properties were Quit Claim Deeded into the name of Amy Moore alone, consistent with a detailed scheme to avoid the Moores' creditors. This was participated in by at least Mr. Fox, who cited his intentions to avoid creditors at the end of paragraph one (of his email dated September 4th, 2019, attached hereto as <u>Exhibit 11</u>).

57. The $146,830.53 of net proceeds from the forced and deeply discounted sale to Rhodes' and as organized and schemed into reality by Jordan Fox came into his and/or his firm's hands on Friday, October 25, 2019. Attorney Fox promptly claimed and/or took $100,000 of the proceeds for himself and/or his firm's benefit. See report to the Court from Fox dated January 17, 2020 and attached hereto as <u>Exhibit 12</u>.  Of the total free cash flow of $146,000 from the deeply discounted and rushed sale of the property $100,000 was taken by Attorney Fox for the benefit of himself and his firm. Even with the multiple chances and pleas from creditors at hand,

Attorney Fox and Amy Moore failed to inform the court.  Scott Brooks sent an email to Attorney Fox the day after the bankruptcy was filed discussing the bankruptcy, attached as <u>Exhibit 13</u>. Attorney Fox and Amy Moore failed to do any checking before proceeding to a closing of the sale of the lots to determine if a bankruptcy proceeding had in fact been filed.  Attorney Fox and Amy Moore were, at a minimum, on inquiry notice and had a duty to make such inquiry. Attorney Fox and Amy Moore chose again to not be forthcoming and honest. Attorney Fox failed to inform the court and others of (1) the recorded LDA, (2) the bankruptcy stay, (3) the cancellation of the foreclosure that he alleged caused the big rush and (4) about the general disputes about who had priority to any cash from the sale. The cash proceeds of the sale ended up as funds subject to dispute when they landed in his Escrow account; these funds were thus further regulated by the Colorado Supreme Court as to the disposition of escrow funds under dispute by any person or organization.

58. Scott Brooks, by virtue of the lot sale provisions in the LDA is entitled to 100% of the first $400,000 in net proceeds and then participates at a lower rate in any additional net proceeds from a sale. Given the consensus and true value of the property and as reached by Counsel in July and August of 2019, Brooks is clearly entitled to at least $812,042 as base damages and calculated as follows:

# Lot Sell-Off Calculations

| | Sale Under Terms of LDA |
|---|---|
| | **Value:  Atty Fox Consensus** |
| 2650 S Fillmore | $                    - |
| 2658 S Fillmore | $                    - |
| Sales Price | $          1,850,000 |
| Amt Owed FirstBank | $             763,264 |
| **free cash flow (per agreement)** | $          1,086,736 |
| Traunch 1 (Fixed, owed to rsb) | $             400,000 |
| **Remaining Gain for other Traunches** | $             686,736 |
| Traunch 2 Sharing % for Ben | 40% |
| bem's participation | $             274,694 |
| funds over bem maximum available to rsb | $             412,042 |
| **Lead Participant (rsb) Ttl Due** | $             812,042 |
| **2nd Participant (bem) Ttl Due** | $             274,694 |
| **Lead Participant %** | 75% |
| **2nd Participant %** | 25% |
| Free Cash Flow Distributed per LDA Formulas | $          1,086,736 |

## FIRST CLAIM FOR RELIEF

### (Breach of Contract as to Benjamin Moore)

59. The allegations of paragraphs 1 – 58 above are hereby incorporated herein by reference.

60. Benjamin Moore has breached his contract, i.e. the Land Development Agreement, with Scott Brooks.

61. Scott Brooks has been damaged thereby in an amount to be determined at trial, but not less than the $812,042 set forth above.

## SECOND CLAIM FOR RELIEF

### (Tortious Interference with Contract)

62. The allegations of paragraphs 1 – 61 above are hereby incorporated herein by reference.

63. At least defendants Amy Moore and Jordan Fox caused Benjamin Moore to fail in performance of his duties to Scott Brooks in the performance of the Land Development Agreement. The conduct of defendants who participated in so doing was wrongful and those

19

participating defendants knew or should have known that their interference was certain to occur as a result of their affirmative actions and their affirmative misrepresentations and active concealments of fact from the Denver District Court.

64. Scott Brooks has been damaged thereby.

65. Pursuant to the Second Claim for Relief, Scott Brooks is entitled to damages in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
### (Unjust Enrichment)

66. Paragraphs 1 – 65 are incorporated herein by reference as if fully set forth.

67. The defendants, and each of them, received a benefit at plaintiff's expense by virtue of the transactions and course of conduct complained of herein.

68.  This occurred under circumstances that make it unjust for the defendants, or any of them, to retain the benefit without commensurate compensation to plaintiff.

69. Plaintiff has been damaged by the actions of the defendants and is entitled to damages in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF
### (Fraudulent Transfer Pursuant to C.R.S. § 38-8-105 and/or the Common Law)

70. Paragraphs 1 – 69 are incorporated herein by reference as if fully set forth.

71. The Transfer(s) constitutes a transfer of Benjamin Moore's interest in an asset.

72. The conduct and the Transfer(s) constitute a transfer(s) of an interest in real properties and Amy Moore thereby gained possession or control of the real properties.

73. The transfer(s) constitute a transfer under C.R.S. 38-8-105(1) as (a) having been made by Amy Moore and Jordan Fox with actual intent to hinder, delay, or defraud any creditor of the debtor, Benjamin Moore, (b) may have been made by or with the knowing acquiesce of Benjamin Moore, and (c) may have been made by transferees Alec Rhodes and Riley Rhodes with the same intent, as well as by one or more John Does, to be determined by discovery herein.

74. The Transfer(s) were made for the benefit of Amy Moore, as an Insider, and for the benefit of Jordan Fox and perhaps others as set forth above, to be determined by discovery herein.

75. The Transfer(s) are fraudulent conveyance(s)

76. Pursuant to C.R.S. § 38-8-108, Brooks is entitled  to entry of a judgment, jointly and severally,  for (a) at least the $812,000 set forth above as against Attorney Fox and Ben Moore and Amy Moore, or (b) one and one-half times the value of the asset transferred or for one and one-half the amount necessary to satisfy his claim together with his actual costs. He, upon information and belief, be entitled to the same as well against Benjamin Moore and the transferees Alec Rhodes and Riley Rhodes.

77. Alternatively, the transfer(s) are fraudulent transfer as contemplated by the common law and the provisions of C.R.S. § 38-8-111. Pursuant to C.R.S. § 38-8-111, Scott Brooks is entitled to a judgment in an amount to be determined at trial on account of the principles of law and equity including the law relating to the law merchant and the law relating to principal and agent,

estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause.

78. Scott Brooks is entitled to entry of an Order quieting title to the Real Property, and determining his interest under the Land Development Contract to be superior to and first in time and prior to any other encumbrance or deed arising after the recording of the Land Development Agreement.

## FIFTH CLAIM FOR RELIEF
### (Fraudulent Conveyance – CRS 38-8-106)

79. Paragraphs 1 – 78 are incorporated herein by reference as if fully set forth.

80. Transferor entities and persons were insolvent at the time of the Transfer(s).

81. Transferors did not receive reasonably equivalent value for the Transfer(s). In addition, the amount of the consideration from the transferor(s) to the transferees was grossly inadequate.

82. The transfer(s) were fraudulent as to Scott Brooks as his claim arose before the transfer(s) was made, the transfers were made to an insider for an antecedent debt, the debtor was insolvent at the time of the transfer(s), and the insiders had reasonable cause to believe that the debtor was insolvent.

83. Pursuant to C.R.S. § 38-8-108, Scott Brooks is entitled to the entry of a judgment against each member of the enterprise, including but not limited to Defendants Amy Moore, Benjamin Moore, and Attorney Jordan Fox, and yet to be identified John Does and John Doe Corporeal Entities. Scott Brooks is also entitled to voiding of the transfer(s) to the extent necessary to satisfy Scott Brooks' claim or an attachment or other provisional remedy against the subject

properties or other property of the transferee(s), and/or an injunction against further disposition of the assets  transferred  or other properties.

## SIXTH CLAIM FOR RELIEF
### (Quieting of Title Pursuant to C.R.C.P. 105)

**84.** Paragraphs 1 – 83 are incorporated herein by reference as if fully set forth.

85. The recorded Land Development Agreement constitutes a lien, debt or cloud against the subject properties that is superior to any conveyance by Amy Moore or Benjamin Moore or any subsequent transferee or any subsequent encumbrance or cloud of record.

86. Scott Brooks is entitled to entry of an Order Quieting Title to the Real Property, and determining his interest under the Land Development Contract to be superior to and first, and in time prior to any other encumbrance or deed arising after the recording of the Land Development Agreement.

## SEVENTH CLAIM FOR RELIEF
### (Civil Conspiracy)

87. Paragraphs 1 – 86 are incorporated herein by reference as if fully set forth.

88. At least Defendants Benjamin Moore, Amy Moore, and Jordan Fox are members of an enterprise, acted in agreement to accomplish their ongoing course of conduct resulting in (a) hindering, delaying, and defrauding of one or more creditors, and/or (b) accomplishing the fraudulent conveyance and further re-conveyances of the subject properties.

89. In furtherance of their course of action, defendants engaged in one or more unlawful acts performed to accomplish their goal(s), or performed one or more lawful acts to accomplish an unlawful goal or goals as referenced in the paragraphs above and throughout the Complaint.

90. Plaintiff has been damaged as a proximate result of such conduct in an amount to be determined at trial.

## EIGHTH CLAIM FOR RELIEF
### (Civil Theft,  C.R.S. § 18-4-405)

91. Paragraphs 1 – 90 are incorporated herein by reference as if fully set forth.

92. Benjamin Moore, Amy Moore, and Jordan Fox, and possibly Riley Rhodes and Alec Rhodes knowingly obtained or exercised control over Brook's property, namely the interest in the real properties represented by the LDA, and for which these defendants have deprived him, without authorization, and continue to do so.

93. These defendants intended and intend to permanently deprive Brooks of the use and the benefit of said property.

94. These defendants retained said property in such a manner as to permanently deprive Brooks of the use and benefit of the property.

95. Benjamin Moore, Amy Moore, Jordan Fox, and, upon information and belief, Riley Rhodes and Alec Rhodes actions have caused and will cause damages to Scott Brooks in an amount to be determined at trial.

96. Further, Benjamin Moore, Amy Moore, Jordan Fox, and upon information and belief, Riley Rhodes and Alec Rhodes actions were and are attended by circumstances of bad faith,

fraud, malice, or willful and wanton conduct, entitling Scott Brooks to an award of treble damages, costs, and attorneys' fees.

## NINTH CLAIM FOR RELIEF

### (For relief for violation of the Colorado Organized Crime Control Act)

97. Paragraphs 1 – 96 are incorporated herein by reference as if fully set forth.

98. Actionable Violations of the Colorado Organized Crime Control Act include, but are not limited to:

A.     Certain violations of the federal Racketeering Influenced and Corrupt Organizations Act as provided at C.R.S. § 18-17-103(5)(a).  Defendants Benjamin Moore, Amy Moore and Jordan Fox  individually and/or collectively, to this action have committed three or more acts of (1) wire and/or (2) mail fraud pursuant to 18 U.S.C. §1341 and §1343 (1)(D) which constitutes a pattern of racketeering activity, each of which occurred within ten (10) years of one another, and the first of which occurred after the effective date of the Colorado Organized Crime Control Act and was used to generate revenues, cash flow, or profits for the enterprise hereinabove described for currently known defendants Amy Moore and Jordan Fox, and others who are John Does or John Doe Corporeal yet to be identified, all to the plaintiffs' detriment, and/or

B.     The aforesaid defendants have, through a pattern of racketeering activity, knowingly acquired or maintained, directly or indirectly, interests in and control of the enterprise herein described, in violation of C.R.S. § 18-17-104(2), and/or

C.     The defendants have knowingly received proceeds derived, directly or indirectly, from a pattern of racketeering activity and used or invested, directly or indirectly, some part

of such proceeds or the proceeds derived from the investment or use thereof in the

acquisition of title to, or some right, interest, or equity in, real property or in the

establishment or operation of an enterprise, in violation of C.R.S. § 18-17-104(1)(a), and/or

D.     The defendants have knowingly conducted or participated, directly or indirectly,

in such enterprise through a pattern of racketeering activity, in violation of C.R.S. §18-17-

104(1)(a).

99. The referenced acts of wire and/or mail fraud constituting a pattern of racketeering

activity include without limitation the fraudulent representations and conduct described in

paragraphs 1 – 98 above and the remaining paragraphs below, including but not limited to

fraudulent conveyances or transfers of the subject properties and transfer of monies through the

use of emails and wire transfers, as well as perpetuation of the enterprise through the use of

emails and wire transfers, and sometimes the U.S. Mail. Fraudulent statements and or fraudulent

conduct in perpetuation and pursuit of the enterprise were undertaken by and through the use of

the telephones, internet, email, and involve wire fraud or mail fraud as defined by statute. This

was and is part of the criminal enterprise and course of racketeering conduct. Use of emails in

this fashion constitutes a form of wire fraud. Emails have been used as a matter of course to

further the scheme of hindering, delaying, and defrauding creditors and/or wrongfully diverting

assets.  Such has occurred through the use of interstate commerce or the instrumentalities of

interstate commerce.

100.     The above referenced acts and other related acts constituted a continuous pattern

of fraud with the purpose of procuring cash flow, revenues, or advances or profits for each of the

above identified defendants and the enterprise and were related to each other, as each was for the

purposes of (a) hindering, delaying or defrauding creditors and/ or (b) improperly obtaining or retaining and using for themselves monies or services for the enterprise controlled by the above identified defendants for their benefit and at the expense of creditors including the plaintiff. Each act had a similar purpose, involved the same or similar participants, and had similar results in affecting plaintiff and others. The identified defendants were able to engage in this pattern by virtue of their respective position in or control of the enterprise. Each of the above identified defendants controlled, conducted and/or participated in the affairs of the enterprise.

101.    The enterprise consists of an association of individuals and corporate and/or other defendants including without limitation, the above identified defendants named in this claim for relief, and all defendants whose names are not currently known. The purpose of the enterprise was to promote and derive revenues, cash flow, or profits from real estate related and perhaps other, transactions, including profiting from hindering, delaying, and defrauding creditors, including Plaintiff as well as procuring the extension of advances of monies, loans, and investment for the purpose of profiting the enterprise and the members therein, through multiple violations of fiduciary duties and false and fraudulent representations.

102.    As a proximate result of the defendants racketeering enterprise and pattern of racketeering activity, plaintiff has suffered substantial damages in an amount to be determined at trial, but believed to be in excess of $800,000, plus continuing accruals of interest, costs, and all costs of collection. Plaintiff is also entitled to recover treble damages against the identified defendants and their costs of suit including attorney's fees, as well as all other relief granted by the federal and state racketeering statutes.

103.     Defendants have violated the civil provisions of the Colorado Organized Crime Control Act ("COCCA"), C.R.S. 18-17-101, *et seq.,* including but not limited to prohibitions found at 18 U.S.C. §§1961 (1)(B) and (1)(D).

**WHEREFORE**, Plaintiff requests and prays for relief on his claims as follows:

A.     On the First Claim for Relief, the entry of a monetary judgment against Benjamin Moore for $812,042.00, plus costs and attorney's fees.

B.     On the First and Second Claims for Relief, and in the event of Plaintiff's election to impose a constructive trust, an Order for possession of the real property and issuance of a Writ of Restitution, directed to the Sheriff of the City and County of Denver and requiring the Sheriff to remove the Defendants, and any other occupants, if any,  claiming an interest under them, including any member of their family, and their property from the premises and place Plaintiff in possession thereof and to make proper return according to law.

C.     On the First and Second Claims for Relief, and in the event of Plaintiff's election to impose a constructive trust, entry of a decree quieting title and vesting title in fee simple in the name of the Plaintiff, free and clear of any alleged homestead exemption for the subject properties, and free of any tenancy or lease and free of any recorded lien or encumbrance subsequent to the recordation of the Land Development Agreement.

D.     On the Third Claim for relief, for entry of a monetary judgment for the value of the benefit received by the defendants.

E.     On the Fourth and Fifth Claims for Relief, the entry of a monetary judgment against Benjamin Moore, all complicit transferees and those part of the enterprise for one and

one-half times the value of the transfer(s), or one and one-half times the amount necessary to satisfy Scott Brook's claim, whichever is less, and in the alternative, entry of an order imposing a constructive trust on the real property, directing the Sheriff's Department of the City and County of Denver to levy execution and sale of the real property in partial satisfaction of the judgment and declaring that such sale shall be without payment of, and free and clear of any alleged homestead exemption for the real property, and free of any tenancy and further ordering the Sheriff to evict and remove from said premises anyone residing therein.

F. On the Sixth Claim for Relief for entry of a Decree quieting title to the real properties in the name of Scott Brooks ahead of and extinguishing any claimed deed, interest in, encumbrance, or lien made of record after his recording the Land Development Agreement, subject only to the interest therein, if any, due to Benjamin Moore, if not offset by the damages otherwise awarded herein against Benjamin Moore. Such decree to be free and clear of any alleged homestead exemption for the real property, and free of any tenancy and further ordering the Sheriff to evict and remove from said premises anyone residing therein or thereon.

G. On the Seventh Claim for Relief, for entry of a monetary judgment for damages as provided by law.

H. On the Eighth Claim for Relief, for compensatory damages, treble damages and attorneys' fees and costs.

I. On the Ninth Claim for Relief, entry of:

(1) A monetary judgment for treble damages, US$2,436,126.00 plus costs, pre-judgment and post-judgment interest, and pre-judgment and post judgment attorney's fees in favor of Scott Brooks and against Amy Moore, Jordan Fox, and other yet to be identified member of the enterprise.

(1) A monetary judgment for treble damages, costs, pre-judgment and post-judgment interest, and pre-judgment and post-judgment attorney's fees in favor of Scott Brooks and against Amy Moore, Jordan Fox, and other yet to be identified members of the enterprise,

(1) A judgment ordering divestment of any interest in any enterprise, including real property,

(1) A judgment imposing restrictions upon the future activities and/or investments of each identified defendant, including, but not limited to, prohibiting any such identified defendant from engaging in the same type of endeavor as the enterprise in which he, she, or it has engage in violation of COCCA,

(1) A judgment ordering the dissolution or reorganization of the enterprise,

(1) A judgment ordering the suspension or revocation of any license, permit, or prior approval granted to any enterprise and/or its members or ring leaders by any agency of the state,

(1) A judgment ordering the forfeiture of any charter of a corporation organized under the laws of this state or the revocation of any certificate authorizing a foreign corporation to conduct business within the state,

(1) A judgment ordering civil forfeiture to the state of all property, real or personal, including money, used in the course of, intended for use in the course of, derived from, or realized through conduct in violation of the provisions of COCCA, as provided by statute,

(1) As to any real property, entry of a judgment of permanent order of abatement, directing the sheriff to seize such property and the ground upon which it is situated, as provided by statute,

(1) Entry of judgment applying proceeds of civil forfeiture for benefit of plaintiff as provided by C.R.S. 18-17-106.

And for such other and further relief as the court deems proper.

Respectfully submitted this 18th day of November 2020.

<u>DEMAND IS HEREWITH MADE FOR TRIAL TO A JURY OF SIX</u>

/s/Andrew L. Quiat
Andrew L. Quiat, Esq., # 1286
The Law Offices of Andrew L. Quiat, PC
P.O. Box 2900
Aspen, CO 81612
Telephone: (303) 471-8558
Email: aquiat@quiatlegal.com
Attorney for the Plaintiff, Robert Scott Brooks